UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | |
| Port Arthur Steam Energy, L.P. | § § | Case No. 21-32373 |
| Debtor. | § § § § | Chapter 11 (Subchapter V) |

### AMENDED CHAPTER 11 (SUBCHAPTER V) PLAN

**COMES NOW**, Port Arthur Steam Energy, L.P., Debtor, and Debtor-In-Possession, and files this Amended Chapter 11 Plan, dated August 5, 2021, pursuant to Subchapter V, 11 U.S.C. § 1189.

### HISTORY OF THE DEBTOR

Port Arthur Steam Energy, L.P. ("PASE") was formed in November 2004 to purchase and rehabilitate the steam cogeneration facility (the "Facility") previously operated by Dynegy Inc. and located at the Port Arthur, Texas calcining plant of Oxbow Carbon and Minerals LLC ("Oxbow"). American Industrial Partners Capital Fund III, L.P. (the "Partnership") invested $38.5 million in the rehabilitation of the Facility, which was completed in August of 2005, six months ahead of schedule.

The Facility was originally built in 1983 and operated profitably for nearly twenty years. The Facility purchased waste heat from Oxbow based on a long-term contract, converted the heat principally to steam, and sold the steam to a neighboring Chevron petroleum refinery under a long term take-or-pay contract. In 2000, when the steam contract expired, the Facility's owner, Dynegy Inc., sold it to Oxbow for a nominal amount and the Facility was mothballed.

The nearby refinery, now owned by Valero Energy Corp. (NYSE: VLO), underwent a 40% capacity expansion that significantly increased its demand for steam energy. PASE negotiated an 18 year take-or-pay contract to sell steam to

Valero based on the spot price of natural gas. In addition, PASE negotiated an eighteen (18) year waste heat purchase agreement with Oxbow which provided Oxbow with 30% of the project's third-party steam and electricity revenues.

Oxbow permanently stopped all delivery of flue gas energy to PASE on June 25, 2018 based upon a manufactured pretext, effectively shutting down PASE's entire steam plant and business, despite multiple years for performance remaining under the Heat Agreement.  As a result of Oxbow's termination of all flue gas energy to PASE, PASE could not perform under its contract with its customer, Valero, and Valero terminated that contract.

PASE has no remedy under the Heat Agreement's arbitration provisions and exculpatory provisions, and during the last arbitration between the parties, Oxbow unilaterally destroyed the only potential remedy that was left to PASE under the Heat Agreement's arbitration and exculpatory provisions, injunctive relief, by orchestrating the removal of the air permits required for PASE to operate.  After the last arbitration between the parties was completed, Oxbow breached an agreement to pay PASE for the approximately $163,332.19 in electricity that PASE bought and provided to Oxbow based on Oxbow's broken promise to pay for it.  Litigation continues between the parties.

Oxbow also owns, operates and maintains three emission stacks used to emit calcining flue gas from their kiln operation. These particular stacks are referred to as "cold stacks" since they are attached to the outlet of the PASE boilers after extraction of heat energy from the flue gas. The flue gas is produced by Oxbow, and released by Oxbow through these stacks into the atmosphere under its air permit.  Corrosive liquid is now leaking out of the cold stacks into the PASE fan housings and require repair/replacement. Approximately 5 years has passed since the cold stacks were replaced, meaning that the cold stacks are now significantly weakened and could potentially fail as in the past when the #3 cold stack catastrophically failed on November 28, 2016.   Therefore, it is not possible for PASE to perform asset removal of much of its major equipment such as the boilers, hot flue gas ducting, and associated pipe-racks.  PASE has no responsibility for the cold stacks or the flue gas emissions.  Further PASE cannot work on the cold stacks since PASE does not own the cold stacks.  Oxbow is responsible for the maintenance and repair of the Cold Stacks.

This bankruptcy has resulted.

## LIQUIDATION ANALYSIS

| | | |
|---|---|---|
| a. | Cash On Hand | $200,000.00 |
| b. | Accounts Receivable | $160,000.00 |
| c. | Funds Held In Escrow | $140,000.00 |
| d. | Office Furniture and Equipment | $3,000.00 |
| e. | Machinery & Equipment | $3,300,000.00 |
| f. | Automobiles | $71,000.00 |
| g. | Customer List | $0.00 |
| h. | Lawsuits | $7,000,000.00 |
| i. | TOTAL | $10,874,000.00 |

LESS:

| | | |
|---|---|---|
| j. | Secured Claims | $0.00 |
| k. | Chapter 7 Fees | $1,000,000.00 |
| l. | Admin Expenses | $750,000.00 |
| m. | Priority Claims | $0.00 |

| | | |
|---|---|---|
| n. | Balance For Unsecured Claims | $9,124,000.00 |
| o. | Total Dollar Amount Of Unsecured Claims | $2,032,395.00 |

| | |
|---|---|
| Percentage In A Chapter 7 | 100% |
| Percentage Under The Plan | 100% |

## PROJECTIONS/FEASIBILITY

The Debtor will proceed to liquidate in an orderly fashion, collecting on its receivables, prosecuting it claims and recovering on any judgments awarded. Funds will then be distributed to allowed claims in an orderly, pro-rata fashion. The Debtor will have sufficient projected disposable income (as defined by § 1191(d) of the Bankruptcy Code) to fund the payments required by this Plan. The proposed payments pursuant to the Plan are as follows:

Term of the Plan:   60 months, in quarterly payments, if and when funds are available (the "Plan Term").

| Beginning Month | Ending Month | Total Amount of <u>Quarterly Payment</u> | Quarterly Savings Fund Deposit | Total Forecast Savings Fund Deposits | Quarterly Available for Creditors and Reserve Funds | Total Available for Creditors and Reserve Funds |
|---|---|---|---|---|---|---|
| 1 | 60 | As Available | N/A | N/A | $ | $ |
|   |   |   |   |   |   |   |
|   |   |   |   |   |   |   |
|   |   | Grand Total: |   | N/A |   | $ |

The final Plan payment is expected to be paid on or before the 60th month following the Effective Date.

**Assumptions utilized for the projections:** The Debtor is assuming the ability to perform an orderly liquidation of its equipment and machinery, and to collect on its outstanding judgments. In addition, it is assumed that pending and proposed litigation will be prosecuted and concluded within the Plan Term.

1. <u>SUMMARY</u>

   1.1. This Plan of Reorganization (the "Plan") proposes to pay creditors from the ongoing operation/liquidation of the Debtor's business.
   1.2. This Plan provides the following classes of claims:
      1.2.1. Class 1 - Priority Claims;
      1.2.2. Class 2 - Secured Claims;
      1.2.3. Class 3 – Unsecured Contingent Claim Of Oxbow
      1.2.4. Class 4 - Non-priority Unsecured Claims; and
      1.2.5. Class 5 - Equity Security Holders.

   1.3. This Plan also provides for the payment of administrative and priority claims.
   1.4. All fees required to be paid under 28 U.S.C. § 1930 that are owed on or before the effective date of this Plan have been paid or will be paid on the effective date.

1.5. All creditors and equity security holders should refer to Articles 3 through 6 of this Plan for information regarding the precise treatment of their claim.

1.6. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)

2. **CLASSIFICATION OF CLAIMS AND INTERESTS:**

   2.1. Class 1 ................................
   
       2.1.1. All allowed claims entitled to priority under § 507(a) of the Code.
   
   2.2. Class 2 ..................................
   
       2.2.1. All allowed claims secured by property of the estate, to the extent allowed as a secured claim under § 506 of the Code.
   
   2.3. Class 3 ..................................
   
       2.3.1. The contingent unsecured claim of Oxbow Calcining, LLC pursuant to ¶8.6 of the Heat Energy Agreement and evidenced by the Final Arbitration Award.
   
   2.4. Class 4..................................
   
       2.4.1. All non-priority unsecured claims allowed under § 502 of the Code.
   
   2.5. Class 5 ..................................
   
       2.5.1. Equity interests of the Debtor.

3. **TREATMENT OF CLASS 1 - ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY CLAIMS**

   3.1. Class 1 is <u>unimpaired.</u>

   3.2. **Priority Claims -** Administrative expense claims and priority tax claims other than Domestic Support Obligations that are entitled to priority under 11 U.S.C. §§ 507(a)(2) through 507(a)(10) shall be paid. If a timely proof of claim is filed, the actual amount of the Priority Claim will be determined through the claims allowance process. Otherwise, the amount scheduled in this Plan, or an amount allowed by court order allowing the administrative claim will control:

| Name of Holder of Priority Claim | Amount of Priority Claim | Interest Rate Under Plan | Amount of Periodic Payment | First Payment of this Amount in Mo. # | Last Payment of this Amount in Mo. # | Total |
|---|---|---|---|---|---|---|
| ATTORNEY FEES (TO BE DETERMINED BY COURT APPROVAL PROCESS) | | | | | | |
| INTERNAL REVENUE SERVICE | | | | | | |
| | | | | | | |

## 4. TREATMENT OF CLASS 2 – SECURED CLAIMS

4.1. Class 2 is impaired. The Debtor is not aware of any Secured Claims.

4.2. The property securing the claims in Class 2 will be liquidated by the Debtor free and clear of the liens, claims and encumbrances existing, and the liens of each of the holders of Class 2 Claims shall otherwise retain their prepetition character and enforceability, subject to 11 U.S.C. § 506, and any enforceable liens shall further attach to the proceeds of any sale or other disposition. Each holder of an allowed Class 2 Claim shall receive an amount equal to their allowed Secured Claim, without interest, within the Plan Term in full satisfaction of their claims against the Debtor or its property.

| Name of Holder of Secured Claim | Claim | Collateral Value | Plan Interest Rate | Security for Claim | Quarterly Payment Amount | | | Starting Month # | Ending Month # | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | P&I | Escrow[1] | Total | | | |
| | $ | $ | % | See Prepetition Security Documents | $ | $ | $ | | | $ |
| Cure Claim[2] | N/A | | | | | | | | | |

---

[1] Only applicable if an escrow for ad valorem taxes or property insurance has been required by the holder of the security interest. If the collateral is a vehicle or other personal property, the "Escrow" amount should be $0.00.

[2] In this Plan, a "Cure Claim" is the amount required to cure any existing default. A "Total Debt Claim" is a claim that will be fully paid during the term of the proposed Plan. As to each claim secured by a security interest, the

| Name of Holder of Secured Claim | Claim | Collateral Value | Plan Interest Rate | Security for Claim | Quarterly Payment Amount | | | Starting Month # | Ending Month # | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | P&I | Escrow[1] | Total | | | |
| Monthly Contract Pmt. | N/A | | | | | | | | | |
| Total Debt Claim | N/A | | | | | | | | | |

4.3. The amount of secured claim to be paid under this Plan is the lesser of the amount of the Collateral Value and the allowed amount of the claim. If a timely proof of claim is filed, the amount of the claim will be determined through the claims allowance process. Otherwise, the amount scheduled in this Plan will control.

4.4. Each claim secured by a security interest is designated to be in a separate class.

4.5. Maintenance of Taxes and Insurance. The Debtor(s) must pay all ad valorem property taxes on property that is proposed to be retained under this Plan, with payment made in accordance with applicable non-bankruptcy law not later than the last date on which such taxes may be paid without penalty. The Debtor must maintain insurance on all property that serves to secure a loan and that is proposed to be retained under this Plan, as required by the underlying loan documents. This Paragraph does not apply to the extent that taxes and insurance are escrowed. Any holder of a secured claim may request in writing, and the Debtor must promptly provide proof of compliance with this Paragraph. If the Debtor fails to provide such proof within 30 days of receipt of a written request, the holder of the debt secured by a lien on the property may purchase such insurance or pay such taxes in accordance with its rights under applicable non-bankruptcy law. Unless otherwise ordered by the Court, payment under this Paragraph may not be undertaken by a transfer of the tax lien on the property.

4.6. The Debtor retains the absolute right to prepay all, or a portion, of the outstanding debt to Class 2 at any time, without penalty.

---

Debtor(s) must propose either (i) a Cure Claim and a Monthly Contract Payment; (ii) a Total Debt Claim; or (iii) in cases in which there is no Cure Claim, a Monthly Contractual Payment.

5. **TREATMENT OF CLASS 3 – CONTINGENT UNSECURED CLAIM OF OXBOW CALCINING, LLC PURSUANT TO ¶8.6 OF THE HEAT ENERGY AGREEMENT AND EVIDENCED BY THE FINAL ARBITRATION AWARD.**
   5.1. Class 3 is unimpaired.
   5.2. Oxbow Calcining, LLC holds a $2,000,000.00 contingent unsecured claim for clean-up costs pursuant to ¶8.6 of that certain Heat Energy Agreement with the Debtor, and as further evidenced by that certain final Arbitration Award confirmed by the 270th Judicial District Court for Harris County on July 23, 2020, Case No. 2020-18313. The Class 3 Claim will be offset entirely by the final Arbitration Award in favor of the Debtor in the amount of $3,409,781.57(plus interest as provided in the judgment), confirmed by the 151st Judicial District Court for Harris County on January 8, 2015, Case No. 2011-74311. The offset shall occur on the Effective Date, with interest continuing to accrue on the remaining balance of the judgment in favor of the Debtor.

6. **TREATMENT OF CLASS 4 – NON-PRIORITY UNSECURED CLAIMS ALLOWED UNDER § 502.**

   6.1. Class 4 is impaired.
   6.2. Unsecured creditors not entitled to priority and not specially classified shall comprise a single class of creditors. Allowed claims shall be paid a pro rata share of the amount remaining after payment of all secured, priority, and specially classified unsecured claims as funds become available and at the discretion of the disbursing agent.
   6.3. The Debtor retains the absolute right to prepay all, or a portion, of the outstanding debt to Class 3 at any time, without penalty.
   6.4. Class 3 will not be paid interest on their claims.

7. **TREATMENT OF CLASS 5 – EQUITY INTERESTS OF THE DEBTOR.**

   7.1. Class 5 is unimpaired.
   7.2. The Partnership interests in the Debtor shall remain unaffected by this Plan.

8. **ALLOWANCE AND DISALLOWANCE OF CLAIMS.**

   8.1. Disputed Claims:
      8.1.1. A disputed claim is a claim that has not been allowed or disallowed by a final non-appealable order, and as to which either:

      8.1.1.1.   a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or

      8.1.1.2.   no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

    8.1.2. Delay of distribution on disputed claims:
      8.1.2.1.   No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order.

    8.1.3. Settlement of disputed claims:
      8.1.3.1.   The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

9. **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

  9.1. Assumed executory contracts and unexpired leases:
    9.1.1. Except as set forth elsewhere in this Plan or in the following sentence, all executory contracts are rejected.

    9.1.2. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than thirty (30) days after the date of the order confirming this Plan.

10. **MEANS FOR IMPLEMENTATION OF THE PLAN**

  10.1.   On or after the Effective Date, the Debtor shall, in a safe, orderly and business-like manner, liquidate the assets of the Debtor.
  10.2.   The Debtor shall collect all amounts due and owing to it, by utilizing any available means.
  10.3.   The Debtor shall act as disbursing agent for all funds to be distributed pursuant to the Plan.
  10.4.   All claims and causes of action against Oxbow Calcining, LLC, and all other persons or entities, including claims under Chapter 5 of the Bankruptcy Code are specifically reserved and shall be prosecuted or settled by the Reorganized Debtor.
  10.5.   Upon confirmation, all property of the estate shall revest in the reorganized Debtor, free of any and all liens, claims and encumbrances,

      including rights of setoff and recoupment, except as otherwise provided in this Plan.

10.6.    All funds currently on deposit with the Harris County State Court's shall be released and paid over to the Debtor immediately.

10.7.    The time for the Debtor to remove the PASE facilities from its physical location is extended to the last day of performance under this Plan.

## 11. GENERAL PROVISIONS

11.1.1.    **Definitions and rules of construction -** The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan.

11.1.2.    **Effective Date -** The effective date of this Plan is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated.

11.1.3.    **Severability -** If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

11.1.4.    **Binding Effect -** The rights and obligations of any entity named, referred to, or has notice of this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

11.1.5.    **Captions -** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

11.1.6.    **Controlling Effect -** Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Texas govern this Plan

and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

11.1.7.    **Corporate Governance –** The Debtor will be managed after the Effective Date by its existing General Partner.

11.1.8.    **Retention of Jurisdiction -** The Court shall retain and have exclusive jurisdiction over this Chapter 11 Case to the maximum extent provided by law for the following purposes following the Confirmation Date:

  11.1.8.1. To determine any and all objections to the allowance and classification of Claims or Interests;
  11.1.8.2. To determine the validity and priority of any Lien;
  11.1.8.3. To determine the Allowed Amount of any Claim, whether secured or unsecured;
  11.1.8.4. To allow any and all applications for allowances of compensation and reimbursement of expenses payable from the estate;
  11.1.8.5. To determine any and all applications or motions pending before the Court on the Effective Date of the Plan, including without limitation any motions for the rejection, assumption or assumption and assignment of any executory contract or unexpired lease;
  11.1.8.6. To consider and approve any modification of this Plan, remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Court, including the Confirmation Order;
  11.1.8.7. To hear and determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of this Plan, the Confirmation Order, any transactions or payments contemplated hereby or any agreement, instrument or other document governing or related to any of the foregoing;
  11.1.8.8. To consider and act on the compromise and settlement of any claim or cause of action by or against the Debtor;
  11.1.8.9. To issue orders in aid of execution and implementation of this Plan and the Confirmation Order, to the extent authorized by 11 U.S.C. § 1142 or provided by the terms of this Plan; and

       11.1.8.10. To hear and determine matters concerning federal, state or local taxes in accordance with sections 346, 505 or 1146 of the Bankruptcy Code.

11.2. **Limitation on Jurisdiction**. In no event shall the provisions of this Plan be deemed to confer in the Bankruptcy Court jurisdiction greater than that established by the provisions of 28 U.S.C. §§ 157 and 1334.

12. **Discharge**
    12.1. On the Effective Date of this Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, pursuant to § 1141(d)(1)(A) of the Code.

Dated: <u>August 6, 2021</u>

AIP/PASE, LLC,
The Debtor's General Partner

By: AIP/PASE HOLDINGS, INC.,
    its Managing Member
    <u>*/s/ Nathan Belden*</u>
    Nathan Belden
    its Secretary